## Case No. 14,990.

### UNITED STATES v. DOW.

[Taney, 34.] [1]

Circuit Court, D. Maryland. April Term, 1840.

CRIMINAL LAW — COPY OF INDICTMENT — LIST OF JURY — PEREMPTORY CHALLENGES — MANNER OF SELECTING JURY—WITNESSES—INDICTMENT—REPUGNANT ALLEGATIONS.

1. In capital cases, the prisoner is entitled to a copy of the indictment, and a list of the jury, mentioning the names and places of abode of such jurors, to be delivered to him two entire days before his arraignment.

[Cited in Logan v. U. S., 12 Sup. Ct. 630.]

2. Under the act of congress of April 30, 1790, c. 36, § 28 [1 Story's Laws, 89; 1 Stat. 118, c. 9], the arraignment is to be regarded as the commencement of the trial; and the two entire days must be exclusive of the day of delivery of the copy of the indictment and list of jurors, and the day of the arraignment.

3. In offences made capital by the act of congress of April 30, 1790, the prisoner may challenge twenty jurors peremptorily; in treason, thirty-five. In indictments for capital offences, under that act, the prisoner may challenge twenty peremptorily, and no more; in offences made capital since that act, he is entitled to thirty-five peremptory challenges, according to the rules of the common law.

4. The act of congress, passed September 24, 1789, c. 20, § 29 [1 Story's Laws, 63; 1 Stat. 88], in referring to the laws of the states in relation to juries, applies only to the mode of selecting them, and not to the number to be summoned. The circuit courts are bound to follow the laws of the respective states in which they are held, in the mode of forming the juries, and in determining upon their qualifications; but the laws of the several states do not regulate the courts of the United States in the number to be summoned; upon this subject, they are governed by the rules of the common law.

[Cited in U. S. v. Richardson, 28 Fed. 69.]

5. The prisoner was indicted for the murder of the captain of the brig Francis, on the high seas; the brig was an American vessel, and the prisoner one of the mariners on board; he belonged to the Malay race, and was baptized and educated in the Christian religion; the witnesses on the part of the United States were two free negroes and one free mulatto. On objection being made to the admissibility of the evidence of one of these negroes, held, that the question was to be determined by the laws of Maryland.

6. Upon general principles, there was nothing in the case of the witness, or in his color, that would make him incompetent to give testimony in any case

7. The result of the legislation of Maryland on this subject, is, that negroes and mulattoes, free or slave, are not competent witnesses in any case wherein a Christian white person is concerned; but they are competent witnesses against all other persons.

1 [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

8. The prisoner could not be regarded as a Christian white person, and therefore the testimony was admissible against him.

9. An indictment which states that the prisoner, "late of the district of Maryland, mariner, on the 31st day of October, 1839, then and there, being on board a certain brig, called, &c., on the high seas, on the Atlantic Ocean, in latitude 33°, out of the jurisdiction of any particular state, and within the jurisdiction of the United States, * * * did, then and there, commit," &c., is bad for repugnancy; and no judgment will be rendered thereon.

10. The words then and there, mean "at the time and place aforesaid," and in this case refer as to time, to the 31st day of, October, 1839, and as to the place, to the district of Maryland; and this allegation (which is a substantive one) is repugnant to the subsequent allegation, that the offence was committed on the high seas, "out of the jurisdiction of any particular state."

11. The court cannot reject any material allegation in an indictment or information, which is sensible and consistent in the place where it occurs, and is not repugnant to any antecedent matter, merely on account of there occurring afterwards, in the same indictment or information, another allegation inconsistent with the former, and which latter allegation cannot itself be rejected.

N. Williams, U. S. Dist. Atty.

Z. Collins Lee and S. Teackle Wallis, for prisoner.

TANEY, Circuit Justice. Lorenzo Dow was indicted for the murder of the captain of the brig Francis, on the high seas; the brig being an American vessel, and Lorenzo Dow one of the mariners on board. He was indicted under the act of congress of April 30, 1790, c. 36, § 28 [1 Story's Laws, 89; 1 Stat. 118, c. 9].

At the trial of the case, the following points were ruled by the court, before the jury were sworn:

1. That the prisoner was entitled to a copy of the indictment, and a list of the jury, mentioning the names and places of abode of such jurors, to be delivered to him two entire days before his arraignment. That, under the act of April 30, 1790, c. 36, § 28 [2 Story's Laws, 89; 1 Stat. 118, c. 9], the arraignment was to be regarded as the commencement of the trial; and the two entire days must be exclusive of the day of delivery of the copy of the indictment and list of jurors, and the day of the arraignment. Fost. Crown Law, 230; 4 Bl. Comm. 351.

2. In offences made capital by the act of April 30, 1790, the party may challenge twenty jurors peremptorily; in treason thirty-five (see section 29); and the prisoner being indicted under this law, he was entitled to challenge twenty peremptorily, and no more. In offences made capital since the act of 1790, the party is entitled to thirty-five peremptory challenges, according to the rules of the common law. U. S. v. Johns [Case No. 15,481.]

3. The act of congress of September 24, 1789, c. 20, § 29 [1 Story's Laws, 63; 1 Stat. 88], in referring to the laws of the states in relation to juries, applies only to the mode of selecting them, and not to the number to be summoned. The circuit courts are bound to

follow the laws of the respective states in which they are held, in the mode of forming the juries, and in determining upon their qualifications; but the laws of the states do not regulate the courts of the United States in the number to be summoned; upon this subject, the courts of the United States are governed by the rules of the common law. U. S. v. Insurgents [Case No. 15,443]; Case of Fries [Id. 5,126].

In this case, the court directed the marshal to summon as many, in addition to those attending on the regular panel for the term, as would make up the number of thirty-six; and that the list of these thirty-six jurors should be delivered to the prisoner, two entire days before his arraignment.

The jury were sworn, and the trial proceeded. It appeared from the admissions on both sides, that the prisoner was a native of the town of Manilla, in one of the Philippine Islands; that his parents were both Malays, living in that town, and subjects of the queen of Spain; that they were Christians, and that the prisoner was baptized and educated in the Christian religion, and had always professed to be a Christian.

At the time of the murder, the captain was the only white person on board; the crew consisted of the Malay, three negroes, and one mulatto; two of the negroes were natives of Philadelphia, and one a native of the state of Delaware; the mulatto was a native of the British province of Nova Scotia; they were all free.

The first witness produced on behalf of the United States was one of these negroes. He was objected to by the counsel for the prisoner, upon the ground, that by the laws of Maryland, a free negro was not a competent witness in any case against the prisoner; or, at all events, not in a capital case.

In deciding upon the admissibility of this evidence, the court must be governed by the laws of Maryland, under the act of congress of 1789, c. 20, § 34 [1 Story's Laws, 67; 1 Stat. 92], which provides, "that the laws of the several states, except where the constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law." It will be necessary, therefore, to review the different acts of assembly, which have been passed by the state upon this subject; for, if the testimony offered is not admissible, it must be on the ground that it is excluded by some statute of the state. Upon general principles, there is certainly nothing in the case of the witness, or in his color, that would make him incompetent to give testimony in any case.

The first act of assembly upon this subject is that of May session 1717, c. 13. The second section of that law provides, that "no negro or mulatto slave, free negro, or mulatto born of a white woman, during the time of his servitude by law, or any Indian slave, or free Indian, native of this or the neighbor-

ing provinces, be admitted or received as good and valid evidence in law, in any matter or thing whatsoever, depending before any court of record, or before any magistrate, within this province, wherein any Christian white person is concerned." And the third section of this law makes the several persons excluded by the second section, witnesses against each other, where other sufficient evidence is wanting, "provided such evidence or testimony do not extend to the depriving of them, or any of them, of life or member."

It will be observed, that this act of assembly disqualifies the persons mentioned in it from giving testimony, in any case wherein a Christian white person is concerned; but permits them to be examined, in the discretion of the judge, against one another, in cases not extending to life or member. This qualified admission of their testimony against each other, was always held to be an implied exclusion of it in favor of one another; and this produced the act of assembly of 1801, c. 109, which permitted them to give testimony for, as well as against, each other, in prosecutions for stealing goods, or for receiving them knowing them to be stolen.

The act of 1808, c. 81, was the next in order, and made them witnesses in all criminal prosecutions, for and against one another. In this act, as well as in the act of 1801, before mentioned, "Indian slaves," and "free Indian natives," are not mentioned, because before the passage of these laws, that unfortunate race had disappeared from the state. And it is also proper to remark, that in the act of 1808, the expression used in the act of 1717, of "mulatto born of a white woman, during the time of his servitude by law," is altogether dropped, and the persons authorized to give testimony are, "any negro or mulatto slave, or any mulatto descended of a white woman, or any negro or mulatto free or freed;" and the persons for or against whom it may be given, in any criminal prosecution, are described in precisely the same words. The acts of assembly that subjected a mulatto, born of a white woman, to a certain period of servitude, were not in force when the law of 1808 was passed; they were repealed by the act of 1790, and again in 1796, c. 67, § 14.

The result of these various acts of legislation is this: negroes and mulattoes, free or slave, are not competent witnesses, in any case wherein a Christian white person is concerned; but they are competent witnesses against all other persons. It is true, that the act of 1808 does not, in so many words, say that negroes and mulattoes shall be competent witnesses in all cases except those wherein a Christian white person is concerned; the language of the statute merely enables them to give testimony in the cases there specified. These were cases in which, among others, negroes and mulattoes had been made incompetent witnesses by the act of 1717; and the effect of the act of 1808 was to repeal so much

of this law. And as negroes and mulattoes, as well as persons of any other description, were competent witnesses upon the general principles of the common law, and as they had been disabled merely by the prohibitory provisions of the act of 1717; they are now competent witnesses in all cases, where the provisions of that statute are no longer in force; and the only disabling clause of that statute still in force, is the one which makes them incompetent where any Christian white person is concerned; the other disabling clauses have all been repealed.

We do not speak of the clauses in relation to Indian slaves, or native Indians; the silence of the laws of 1801 and 1808, in relation to this class of persons, has already been accounted for. The prisoner, however, is not an "Indian slave, or a free Indian native of this or any of the neighboring provinces;" and if the provisions of the act of 1717, in relation to persons of that description, be regarded as still in force; and if negroes or mulattoes would be incompetent witnesses against them, in cases affecting life or member, yet the prohibition does not reach the case of the prisoner.

The only question is, whether he is to be regarded as a Christian white person? We think he is not; the Malays have never been ranked by any writer among the white races. But the act of 1717, which excludes the testimony of negroes and mulattoes, in cases where Christian white persons are concerned, did not look to the differences, moral or physical, which have been supposed to exist between the different races of mankind; the law was made for practical purposes, and grew out of the political and social condition of the colony. The colonists were all of the white race, and all professed the Christian religion; from the situation of the world at that time, no persons but white men professing the Christian religion could be expected to emigrate to Maryland; and if any person of a different color, or professing a different religion, had come into the colony, he would not, at that time, have been recognized as an equal by the colonists, or deemed worthy of participating with them in the privileges of this community. The only nations of the world which were then regarded, or perhaps entitled to be regarded, as civilized, were the white Christian nations of Europe; and certainly emigrants were not expected or desired from any other quarter.

The political community of the colony was composed entirely of white men professing the Christian religion; they possessed all the powers of government granted by the charter. Christian white men could not be reduced to slavery, or held as slaves in the colony; but they might, according to the laws of the colony, lawfully hold in slavery negroes or mulattoes, or Indians. The white race did not admit individuals of either of the other races to political or social equality; they were regarded and treated as inferiors, of whom it was lawful, under certain circumstances, to make slaves. These three races existing in the same territory, one possessing all the power, and holding the other two in a state of subjection and degredation, it was natural, that feelings should be created by such a state of things, that would make it dangerous for the white population to receive as witnesses against themselves the members of the two races which it had thus degraded; hence free negroes and mulattoes, and free Indians of this or the neighboring provinces, as well as those who were held in slavery, were disqualified from being witnesses against Christian white men. No one who belonged to either of the races of which slaves could be made, was allowed to be a witness where any one was concerned who belonged to the race of which the masters were composed.

In order, therefore, to make the negroes and the mulatto incompetent witnesses in this case, it must be shown that the prisoner belonging to the white race, that is to say, to that race of men who settled the colony of Maryland, and formed its political community, at the time the act of 1717 was passed. But it is admitted, that he is a Malay; and the Malays are not white men, and have never been classed with the white race. In Maryland, they were certainly regarded as belonging to one of those races of whom it was lawful to make slaves, and who, according to the laws of England and of the colony, were legitimate objects of the slave trade. This appears by the following case. By the act of assembly of Maryland of 1715, c. 44, § 22, it is declared, "that all negroes and other slaves already imported, or hereafter to be imported into this province and all the children now born, or hereafter to be born of such negroes and slaves, shall be slaves during their natural lives." It became a question, under this act, whether the descendant of a woman who was imported as a slave from Madagascar, could be held in slavery in Maryland. 3 Har. & McH. 501. This case is not fully stated in the report; I have examined the original papers. It was proved that the mother of the petitioner was a yellow woman with straight black hair, and that she was not of the negro race, and the testimony shows that it was upon this fact that the petitioner chiefly relied; she was undoubtedly a Malay, according to the description in the evidence. The court said that as Madagascar was a country where the slave trade is practised, the petitioner must show that her ancestor was free in her own country, in order to entitle her to freedom here. Now, it is well known that the Malay race form a part of the population of Madagascar (1 Maltebrun's Geography, 192, 586; 2 Murray's Geography, 525; McCul. Dict. 786; Wyatt, Nat. Hist. 22, 23; Ives' Voyage, 5; 2 Raynal's East & West Indies, 227); and consequently, under this decision, may be held in slavery in this state, if they were

slaves in their own country, and when imported here as slaves, they are presumed to have been slaves in their own country, till the contrary appears.

It follows, from this decision, that Malays might lawfully be held in slavery in the colony of Maryland, and consequently, are not embraced by the description of white men as mentioned in the act of 1717, and the testimony offered is not excluded by that law. The case before the court, therefore, stands upon the general principles of the common law, and the witnesses offered by the United States are competent witnesses.

It may be proper to say a few words in relation to the cases embraced by the third section of the act of 1717. By that section negroes, mulattoes and Indians were not witnesses against one another, in cases which might affect life or member. The policy of this section obviously stood upon very different principles from that which dictated the total exclusion of their testimony against white persons. It arose from the barbarous and brutal ignorance of the two excluded classes, and their crude and monstrous superstitions, which rendered them incapable of feeling or appreciating the obligation of an oath, as felt and appreciated in a Christian community; and it was not, therefore, deemed safe to receive them as witnesses, even against one another, in the more serious or grave offences, lest they should avail themselves of the privilege in order to obtain revenge for real or supposed injuries. Even the limited extent to which they might be heard was discretionary with the judge, and he might, if he deemed it proper to do so, refuse to hear them; and if he heard them at all, it must be against one another; they could in no case whatever be received as witnesses in behalf of each other.

In process of time, however, when the Indians had disappeared from the state, and the negro and mulatto population had become instructed in the doctrines of the Christian religion, and made aware of the sanctity and obligation of an oath, the reason which had excluded them as witnesses, even in cases where individuals of their own class were concerned, no longer existed; and the act of 1808, therefore, made them competent in all cases for and against one another. In other words, it made them competent in all cases in which they had been disabled by the act of 1717, except in the case where white persons or Indians were concerned; in the case of white persons, the reasons of policy which dictated the exclusion remained unchanged; and in the case of the Indians, the law had no longer any practical operation, as there were no Indians, free or slave, remaining within the borders of the state.

If the third section of the act of 1717 was still in force, we must have regarded it as an implied declaration that negroes or mulattoes, free or slave, were incompetent witnesses, in any case where life or member

was at stake, and upon that principle have rejected the testimony now offered on behalf of the United States. But the act of 1808 having restored their competency in all cases except those above mentioned, and the case of the prisoner not being within either of those exceptions, the question must be determined upon common law principles, and the testimony of these witnesses must, therefore, be admitted.

The testimony was accordingly given to the jury, who found the prisoner guilty of murder.

A motion in arrest of judgment was made by the prisoner's counsel, and, after full argument, the court gave the following opinion, arresting the judgment.

TANEY, Circuit Justice. The objection taken to the indictment, upon the motion in arrest of judgment, is, that it contains averments repugnant to one another, in relation to the place where the offence was committed. The first count in the indictment states that "Lorenzo Dow, late of the district of Maryland, mariner, on the 31st day of October 1839, then and there, being on board a certain brig called the Francis, belonging to a citizen of the United States, on the high seas, on the Atlantic ocean, in latitude thirty-three," out of the jurisdiction of any particular state, and within the jurisdiction of the United States, did, then and there, commit the crime charged in the indictment. The objection is, that the word "there," first above mentioned, refers to the district of Maryland; that it is an allegation that the crime was committed within that district, and consequently, that this allegation is repugnant to the subsequent averment, in the same sentence, that it was committed "out of the jurisdiction of any particular state."

We have carefully examined the precedents, and we are satisfied that the words "then and there," as first above introduced, are not to be found in indictments in analogous cases, in any book of approved authority. The words "then and there," which so frequently occur in indictments, mean nothing more than the words "at the time and place aforesaid;" they necessarily imply that a certain time and a certain place have been before mentioned, to which they relate; and if no time and place have been before mentioned, the words "then and there" must be insensible and without meaning.

In the case under consideration, the district of Maryland is the only place, and the 31st of October, 1839, the only time mentioned in the indictment, before the words "then and there," which are now in question. If, instead of using these words, the indictment had said, tha: "at the time and place aforesaid," Lorenzo Dow, on board the brig Francis, committed the murder, there would be no doubt that the place referred to, was the district of Maryland; because it is the only place before mentioned in the indict-

ment. We have already said that the words "then and there" mean the same thing with the words "at the time and place aforesaid;" this clause in the indictment is, therefore, a plain averment that at the date before mentioned, and at the district of Maryland, Lorenzo Dow, on board the brig Francis, committed the crime of which he has been found guilty. But this averment is repugnant to the allegation in the same clause of the indictment, which states that, at the time therein mentioned, he committed the crime on board the brig Francis, "out of the jurisdiction of any particular state;" for if the place at which he committed the murder was out of the jurisdiction of any particular state, it could not be at the district of Maryland.

It has been argued, in support of the indictment, that these words "then and there," which are manifestly out of place, may be regarded as surplusage. But the rule upon this subject is very clearly stated in the case of Rex v. Stevens, 5 East, 244, where Lord Ellenborough says: "I do not find any authority in the law which warrants us in rejecting any material allegation in an indictment or information, which is sensible and consistent in the place where it occurs, and is not repugnant to any antecedent matter, merely on account of there occurring afterwards, in the same indictment or information, another allegation inconsistent with the former, and which latter allegation cannot itself be rejected."

The rule of law here stated, undoubtedly is the true one, and it must decide the case before us. For here, the averment in question, relating to the place at which the crime was committed, is a material one, because we have no jurisdiction if this averment is true; it is sensible and consistent where it occurs, because such a crime might have been committed on board the brig Francis, within the district of Maryland; it is clearly not repugnant to any antecedent matter; but it is repugnant to the subsequent allegation, that the crime was committed out of the jurisdiction of any particular state; and this latter averment cannot be rejected, because the jurisdiction of this court to try and punish the offender depends upon it. We have no jurisdiction unless the offence was committed out of the jurisdiction of any particular state. The allegations as to place are therefore both material; they are repugnant to one another; and as neither can be rejected, the indictment is fatally defective.

If we were at liberty to look into the evidence given upon the trial, the objection to the indictment might easily be disposed of; for the brig Francis does not appear to have been at any time within the district of Maryland, and all the evidence states that the act for which the prisoner is indicted was done on the high seas, as charged in the latter averment. But the court are not at liberty to look beyond the indictment itself. He has been found guilty of the crime charged in that indictment—according to one allegation, that crime was committed in the district of Maryland; according to another, it was committed out of the jurisdiction of any particular state. In the first case, we have no jurisdiction; in the latter, we have; but we have no right to go out of the indictment, and inquire which of these conflicting allegations contains the truth.

The rules of law applicable to indictments, are undoubtedly in many instances technical and nice; but they have been long and well established, and no court has a right to disregard them, even in the case of the humblest individual, or the most guilty offender.

The case before us, however, is rather matter of substance than one of technical form. Certainly, a court ought not to be permitted to inflict punishment, unless the offence is first found by the jury. The verdict of guilty finds the precise offence charged in the indictment, and none other; and, unless the indictment clearly shows that it was committed within the jurisdiction of the court, the principles of justice, as well as the principles of law, forbid the court to proceed to judgment.

We have spoken, so far, of the first count in the indictment; the same defect is found in the remaining three counts. The judgment must therefore be arrested.

The prisoner was re-indicted and tried, and found guilty. Sentence of death was passed upon him, but he was subsequently pardoned by the president of the United States.